NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0102
     Facsimile: (213) 894-6269
     E-mail:    andrew.brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-11-AB |
|---|---|
| Plaintiff, | GOVERNMENT'S *EX PARTE* APPLICATION FOR JUDICIAL FINDING THAT DEFENDANT BREACHED HIS PLEA AGREEMENT; EXHIBITS |
| v. | |
| JEFFREY YOHAI, | Hearing: TBD |
| Defendant. | |

Plaintiff United States of America hereby seeks a judicial finding that defendant breached his plea agreement.

Dated: April 2, 2019          Respectfully submitted,

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

*Andrew Brown*
ANDREW BROWN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant Jeffrey Yohai ("defendant") signed his plea agreement on January 10, 2018, which is when it took effect according to its terms. (Plea Agreement ¶ 25: "This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney."). Defendant pled guilty to conspiracy to commit wire fraud on February 26, 2018. The plea agreement imposed many obligations on defendant, including that he "obey all conditions of any bond, and obey any other ongoing court order in this matter" and "[n]ot commit any crime." (Plea Agreement ¶ 2(d) and (e)). Defendant violated these obligations, however, by committing new offenses while awaiting sentencing, including ones for which both federal and state arrest warrants were issued. Indeed, defendant even admitted to some of those crimes when he told Pretrial Services and, through his attorney, the Court, that he had been using methamphetamine and cocaine in MDC, which he argued was a justification for releasing him so that he could attend a private residential drug treatment facility. As set forth in the separate filing under seal, defendant violated other conditions of his plea agreement, too. Accordingly, the Court should find that defendant breached his plea agreement, thereby releasing the government from its obligations under the plea agreement.

**A. Plea Agreements Are Interpreted According to Contract Law**

In <u>United States v. Sandoval-Lopez</u>, 122 F.3d 797, 800 (9th Cir. 1997) (citations omitted), the Ninth Circuit held that:

> Plea bargains are contractual in nature and subject to contract-law standards. Just as with other forms of contracts, a negotiated guilty plea is a "bargained-for

> *quid pro quo*." Thus, either party can be said to "breach" a plea bargain if it fails to live up to the promises it made under the terms of the agreement. Where a defendant has breached a plea agreement, courts have found the government to be free from its obligations.

Here, the plea agreement defendant signed also expressly states that the government will be released from its obligations under the plea agreement if the court finds that defendant breached any of his obligations:

> Defendant agrees that if defendant, at any time after the effective date of this agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached. <u>All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach</u>, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty pleas, (b) the USAO will be relieved of all its obligations under this agreement, and (c) defendant will still be bound by defendant's obligations under this agreement.

(Plea Agreement ¶ 26, emphasis added). Because one of the obligations on the government in the plea agreement was not to use certain information at sentencing, if the Court found that defendant had breached his plea agreement, the government could provide that information, which has so far been withheld, to the Probation Office and Court.

**B. Defendant's admitted methamphetamine and cocaine use in jail demonstrates by more than a preponderance of the evidence that he breached his plea agreement**

The "government bears the burden of proving that the defendant breached his agreement by a preponderance of the evidence." <u>United States v. Plascencia-Orozco</u>, 852 F.3d 910, 920 (9th Cir. 2017). Here, there is irrefutable evidence that defendant breached at least two of

2

his plea agreement obligations by using and possessing both cocaine and methamphetamine while at the Metropolitan Detention Center ("MDC"):

1.   On January 31, 2019, MDC staff noticed defendant acting strangely, as if on drugs.  Defendant denied using drugs                                              Accordingly, defendant was given a urinalysis.  (Exh. 1).

2.   The urinalysis came back positive for both cocaine and methamphetamine.  (Exh. 2 and 5).  At a disciplinary hearing at MDC, defendant was found to have used narcotics despite his defense that he had not placed his initials on the seal of the cup that contained his urine sample.  (Exh. 6-8).

3.   Defendant's financial records at MDC show that he uses the limited money he receives from his mother to make payments to purported "friends" in the poorer areas of greater Los Angeles that he does not even communicate with by telephone or email.  (Exh. 10-12).  Because prisoners do not have access to currency, of course, it is common to pay for drugs in prison by sending "gifts" to the dealers' accomplices and loved ones who are out of prison.

4.   Defendant admitted to Pretrial Services that he had used methamphetamine and cocaine while at MDC.  (Pretrial Services Report for Detention Review Hearing on March 1, 2019).

5.   Defense counsel, acting as defendant's agent, cf. F.R.E. 801(d)(2)(C) and (D), argued to the Court on March 1, 2019, that defendant should be released to a drug treatment facility because his admitted use of drugs at MDC showed that he was not getting sufficient drug rehabilitation at that facility.

3

Defendant's admitted use of cocaine and methamphetamine at MDC is, of course, a new felony, 18 U.S.C. § 1791(a)(2), and a breach of his obligation to "[n]ot commit any crime." (Plea Agreement ¶ 2(e)). Similarly, it is a violation of Magistrate Judge Mumm's order that defendant "not use or possess illegal drugs," (dkt. 11, page 3), and defendant's obligation in the plea agreement to "obey all conditions of any bond, and obey any other ongoing court order in this matter." (Plea Agreement ¶ 2(d)).

### C. Defendant's other new crimes committed while on release are also breaches of the plea agreement

On October 17, 2018, the government obtained an arrest warrant from Magistrate Judge Abrams for defendant for renewing his conspiracy to commit wire fraud while free on bond after having pled guilty before this Court in this case. (CR 18-834-AB, dkt. 1). The complaint affidavit described a long pattern of new fraud by defendant that parallels the fraud to which he previously pled guilty in this case, including the following:

Home Rental Frauds:

Defendant gained the trust of Aaron Coppelson, and access to his luxury home, by falsely claiming that defendant had $13 million of equity in a property that actually had none. (CR 18-834-AB, dkt. 1, Complaint Affidavit ("Compl. Aff.") page 14, lines 3 to 12). Defendant repeatedly arranged to rent out Coppelson's Marcheeta home on Coppelson's behalf, but contrary to their agreement collected and spent the rent from the tenants himself. In each instance, defendant agreed to forward the rent to Coppelson, but actually provided either bouncing checks, or falsely claimed to have wired the funds or deposited them on Coppelson's behalf. Defendant even provided

4

altered documents that purported to be wire confirmations, or photographs of deposit slips and cashier's checks as "proof" of payments which, of course, never occurred. (Compl. Aff. page 14, line 18 through page 22, line 21).

Defendant executed similar frauds on a number of other real properties, too. An associate of defendant's told him that one homeowner had contacted law enforcement because defendant had been renting the property without his authority. This resulted in the following text exchange on September 26, 2018:

Text to defendant: "You're no Dudley do right in the house rentals bro you know what I'm talking about haha"

Text from defendant: **"I'm the furthest thing from Dudley do right[.] I'm Dudley do wrong[.] I'm Dudley do whatever the fuck he wants[.]"**
(Exh. 15).

### Coachella Artist Passes Fraud

As with the home rental fraud, defendant offered for sale expensive and exclusive "Artist Passes" for the Coachella music festival that he did not, in fact, have. As with the home rental fraud, he engaged in elaborate ruses to lull disgruntled buyers into thinking that he would refund their payments to make up for the fact that they did not get their tickets, again including a fabricated "wire confirmation" and purported PayPal payment that, of course, never occurred. (Compl. Aff. page 25, line 23 through page 27 line 19). Defendant was arrested on state charges for this offense, but it has not been resolved because he is in federal custody.

Pawning Stolen Property

Brian Zeng rented one of defendant's properties and kept his musical instruments worth about $20,000 there. One day during the term of his lease, he returned to find the instruments missing, and reported this to defendant, who informed him that another person staying at the same property had taken them. Even though defendant therefore knew that the instruments had been stolen, he pawned them three days later, providing his New York driver's license and thumbprint to do so. (Compl. Aff. page 27, line 20 through page 28 line 27). Defendant was also arrested on state charges for this offense, but it has not been resolved yet because he is in federal custody.

Marijuana Trafficking Conspiracy

Defendant also engaged in a conspiracy to distribute marijuana after he pled guilty in this case. A search of defendant's two iPhones revealed numerous photographs of marijuana and many chats about purchasing and selling marijuana, some of which are pasted below:

1. Defendant ("JY") and an unknown person (UP) with cellular telephone number (909)687-5305 had a conversation on October 2, 2018, using Instant Messages on defendant's iCloud account regarding defendant purchasing drugs, which included the following:

UP: What time do you think you'll arrive

JY: Should be there by 1

UP: So there's plenty more of the cherry ak [Cherry AK-47, a marijuana strain]. 100+ lemons [another marijuana strain] gone. And couple gdp's [GrandDaddy Purple, a marijuana strain]

JY: How much lemon left? Cherry he didn't want

6

```
1        UP: No lemon this is last unit
2        JY: When is there more
3        UP: There's new strains just got in...I'm gunna check them today
4        JY: Ok  How much GDP [GrandDaddy Purple, a marijuana strain]?
5
6        2.   Defendant engaged in a conversation on September 25-26,
7   2018, using Instant Messages on defendant's iCloud account with a
8   person named "Nela" regarding defendant selling drugs, including the
9   following:
10       JY: OG Deps [a marijuana strain grown outdoors using a light
11  deprivation, or "dep," technique] Have 20
12       Nela: Okay
13       JY: 30 avail right now  Is that what u want?
14       Nela: Ima see about it tomorrow I think everyone asleep already
15       JY: No doubt let me know.
16
17       3.   Defendant engaged in conversations on September 21 through
18  October 25, 2018, on defendant's iCloud account with a person named
19  "Scoobs" regarding defendant buying drugs, including the following:
20       JY: Able to scoop either product?
21       Scoobs: My boy with that shit is outta town I'm waiting to hear
22  back from my other guy
23       JY: Ok lmk it's hard to find this shit
24       Scoobs: Yea I know
25       JY: U in town tonight?  Got a big order
26       Scoobs: I won't be back in LA till around 2
27       JY: That ok  Need a half  Can you meet at my hotel in Weho
28       Scoobs: Ok yea that's cool
```

1     JY: Cuanto??

2     Scoobs: 500

3     JY: Let me know eta if u can cause we won't be up much longer. It's for a homey of mine who needs to pick up mad early and take some to San Diego for his boys bachelor party

6     Scoobs: Where are you gonna be at? What did you need?

7     JY: Be at hotel  Finding amount

8     JY: Same as last time

9     Scoobs: No prob

10     JY: And can u bring me like 4/5 empty baggies? Need to divide it up for some people

12     Scoobs: Ok I got you

13     Scoobs: What did you need?

14     JY: Not sure yet either the same as last or only a ball

15     Scoobs: Ok

17     4.   Defendant also engaged in conversations on August 29 through October 4, 2018, on WhatsApp with a person named "Asian Chris Blue Jay" regarding defendant distributing drugs, including the following:

21     Chris: What kind of work is it and what price range and how many are aval

23     JY: They pick up everyday whatever you need. Sours Glue PG's OG's [various strains of marijuana] etc… They have 5 strains he said

25     Chris: He's looking to unload or looking to buy

26     JY: Unload

27     Chris: Ok I can do things depending if it's what I'm looking for, wouldn [sic] need a sample pack of whatever your [sic] trying to

8

unload, takes about a day to show and put together orders if interested  Any idea on price if it's gh [a marijuana strain] Light dep outdoor [a marijuana growing technique] etc

    JY: Pricing depends on weight

    Chris: Lol we'll [sic] weight depends on pricing

    JY: What do u need?

    Chris: Our major buyers tho just FYI prefer indoor which we have on lock but my locals do need gh but in only quantity's [sic] of 20-50 an order  But I get orders weekly at leaset 3-5 bulk orders half box etc.

    JY: Ok that's cool  If u in town we can show u the samples

    Chris: Any kind of g hog from 950-1050 or any good flavors at that cost

    JY: He can

    Chris: How about tomorrow? Just wanna see quality if I could work with it but if it's what I'm looking for maybe we can do some things together (fist punching emoji)

    JY: ("okay" sign emoji)

    JY: Can do Sour [an adjective to described several marijuana strains] at 800  OG [a marijuana strain] at 950 or 1000 he said depending on size and glue [another marijuana strain] at 900/950 depending on size

    Chris: Ok. Can I see one of each please

That defendant consummated at least some of these transactions is shown not only by the photographs of the marijuana found on his phone (e.g., exh. 13-14), but also on his having offered marijuana as

9

collateral for his debts, as seen but rejected by home rental victim Coppelson. (Compl. Aff. page 17, lines 19-26).

### D. The Government Requests a Ruling Well in Advance of Sentencing

The plea agreement prohibits the government from relying on certain information at sentencing. If the Court were to find, however, that defendant breached his plea agreement, then the government would be free to provide all the information it possesses to the Court at sentencing. Because the government expects sentencing in this case to be unusually complicated and contested, it hopes to file its sentencing papers three weeks in advance of the sentencing, so that its brief may be fully considered in a revised Presentence Report issued at least a week before sentencing. Sentencing is currently set for May 17, 2019. Either an early ruling on defendant's breach of his plea agreement, or a sentencing continuance, would permit the Probation Office and the Court adequate time to consider the government's filing, the contents of which will depend on the Court's ruling on this motion.

The defense, which reviewed an earlier draft of this brief, opposes this application and will file an opposition by April 9, 2019.

**CONCLUSION**

Defendant repeatedly and grossly violated his bond conditions by committing new crimes. Indeed, this Court previously ordered his bond revoked for that reason. (Dkt. 49). Each of these new crimes was a violation of defendant's obligations under his plea agreement in two ways: First, they were violations of his obligations to "obey all conditions of any bond, and obey any other ongoing court order in

this matter." (Plea Agreement ¶ 2(d)).  Second, they were violations of his obligation to "[n]ot commit any crime."  (Plea Agreement ¶ 2(e)).  Defendant agreed that, "All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach."  (Plea Agreement ¶ 26).  The Court should find that at least one of defendant's crimes committed after he signed the plea agreement has been established by a preponderance of the evidence, and hold defendant to the bargain he made by declaring that defendant breached his plea agreement, thereby enabling the government to provide to the Court and the Probation Office all the information it has gathered on defendant that bears on sentencing.