NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0102
    Facsimile: (213) 894-6269
    E-mail:    andrew.brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Nos. CR 18-11-AB, |
|---|---|
| Plaintiff, | CR 19-271-AB |
| v. | GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE REPORT AND SENTENCING POSITION; DECLARATION OF SA EBADI; EXHIBITS |
| JEFFREY CRAIG YOHAI, | |
| Defendant. | Hearing:  November 8, 2019 |
| | 1:30 |

I.    **OBJECTIONS TO THE PRESENTENCE REPORT**

The government concurs in the findings of the Presentence Report with the following exceptions:

A.    **DEFENDANT WAS A LEADER/ORGANIZER OF MORE THAN FOUR PARTICIPANTS**

The sentencing guidelines provide for a four-level enhancement for a person like defendant Jeffrey Craig Yohai ("defendant") who "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  USSG § 3B1.1(a).  The criminal participants defendant led and organized

are described in the previously filed GOVERNMENT'S SEALED OBJECTIONS TO THE PRESENTENCE REPORT.

### B. ACTUAL LOSS IS UNDERSTATED

While the government agrees that the loss enhancement is +20-levels for actual losses between $9.5 and $25 million, the PSR fails to include a number of victims.  Because most of those victims lost only about $100,000 or less to defendant, which pales in comparison to the total damage defendant inflicted, the government has limited its loss objection to the following four sets of victims:  the Hoffmans, whom defendant defrauded out of $3 million; Matthew Behar, defendant's own cousin whose identity he used to run up over $100,000 in debt; Dr. Coppelson, whom defendant defrauded out of over $250,000; Ms. Lazzarini, from whom defendant rented a luxury estate for $120,000 for two weeks, but cheated out of the rental fee; and Mr. Wang, whom defendant cheated out of $15,000 for a rental.  (Ebadi Decl. pages 13-26.)

## II. THE 3553(A) FACTORS

### A. DEFENDANT IS FORTUNATE AND HAD A PRIVILEGED UPBRINGING

Defendant appears to have had all the advantages in life.  He is intelligent, articulate, educated, charming, tall, handsome, and physically healthy.  He "completed seven Advanced Placement classes" in high school and "was a member of the National Honor Society," graduating in the top 10% of his class at the elite Lynbrook High School, which is itself ranked in the top 4% of public high schools nationally.  (PSR ¶ 116; 2018 U.S. News and World Report ranked Lynbrook H.S. 809 out of 20,500 public high schools.)  He graduated with a B.A. from New York University in 2004.  (PSR ¶ 117.)

Not surprisingly given his academic success, defendant "enjoyed a comfortable upper middle class upbringing . . . near a golf course and the ocean." (PSR ¶ 88.) His mother did not need to, and did not, work outside the home while raising defendant. Defendant enjoyed the advantages of a traditional two-parent household including "family outings and travel," his parents' attendance at his "school activities," and even his father coaching his "basketball and Little League teams." (Id.)

Defendant could have done anything with this background. But he chose to use his many gifts to prey on those who trusted him, including friends and even family, taking their savings so he could splash out on luxury housing, automobiles, and high-living, which is a seriously aggravating factor.

**B.  DEFENDANT'S DRUG USE AND GAMBLING DO NOT WARRANT A REDUCED SENTENCE**

Defendant has a long history of abusing drugs. According, to defendant, he used cocaine first when he was 12 years old, and continued to use it a few times a week through college to "have fun." (PSR ¶ 107.) He experimented with heroin when he was 16, and also PCP and ecstasy while in high school. (PSR ¶ 106.) Defendant continued his drug abuse off and on until his arrest, with his recent drugs of choice being alcohol, cocaine and the prescription medication Vynase which, like the more famous medication Adderall, is used to treat ADHD. (PSR ¶ 109-114.) In fact, as the Court knows from the exhibits attached to the Government's Ex Parte Application for Judicial Finding that Defendant Breached His Plea Agreement, defendant continued to abuse drugs even after he was

jailed in this case, and was also involved in drug sales just before his arrest.  (Dkt. 53.)

Drug abuse is a disfavored ground for a sentencing reduction. Instead, the guidelines wisely recommend that it be addressed on supervised release:

> Drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure. Substance abuse is highly correlated to an in-creased propensity to commit crime. Due to this increased risk, it is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program (see §5D1.3(d)(4)).

USSG § 5H1.4.  Similarly, defendant should be considered for the RDAP program, which not only might help defendant with his drug problem, but which could also substantially reduce the actual time defendant spends in prison.  The Court should not, however, further reduce defendant's sentence under the 3553(a) factors because of his long history of drug abuse.  Indeed, his documented history of failed treatments for drug abuse, including high-priced, private, in-patient drug rehabilitation stints, suggests little reason to hope that further treatments will have a lasting effect on defendant.  (PSR ¶¶ 91, 108, 109, 110, 111.)

Defendant also states that he has had a gambling problem.  (PSR ¶¶ 99, 122.)  As with his drug problem, defendant was fortunate enough to have access to treatment programs for it, as well as loved ones who urged him to undergo treatment.  (PSR ¶ 100.)  The Sentencing Commission has flatly decreed that, "Addiction to gambling is not a reason for a downward departure."  USSG § 5H1.4.

Nor should the Court reduce defendant's sentence for past gambling problems under Section 3553(a).

### C.   THE SUICIDE OF DEFENDANT'S BROTHER IS UNRELATED TO HIS DRUG ABUSE AND VICTIMIZATION OF OTHERS

Defendant's brother, who was seriously mentally ill, committed suicide in 2007. (PSR ¶ 90.)  The death of a loved one is always hard, and especially so when it is of a young person by suicide. Yet there is no logical connection between loss of a loved on the one hand with committing a multi-million dollar fraud lasting at least five years on the other.  Indeed, it would be much more reasonable to expect that the brother of a suicide would show more empathy for others, not less, having felt viscerally his brother's anguish as well as his own and that of his parents.  Many people who suffer losses like defendant's channel their experiences for the good, raising money for cancer research, say, after losing someone to that disease, or volunteering for a suicide-prevention organization in hopes of sparing others the pain they felt, for someone in defendant's situation.

That was not the path defendant took, however.  He chose instead to live a flashy, bi-coastal existence focused on hedonistic pleasures.  He rented vacation properties for $60,000 per week, for example.  (Ebadi Decl. page 25.)  He enjoyed a life that included high-stakes gambling, sometimes running his own poker game, and other times gambling at casinos or indulging in sports betting. (PSR ¶ 99.)  And he focused on the party drug, cocaine.  While he now says "it was to cope with his brother's suffering and subsequent suicide," even he has trouble staying on message, candidly admitting that he has a history of using "anything and everything because I

was in a rock band." (PSR ¶ 105.)  Indeed, according to defendant his cocaine use began when he was 12—that is, 13 years before his brother's suicide in 2007—so it seems fanciful to attribute it to that tragedy. (PSR ¶ 107.)

Assuming for the sake of argument that defendant's cocaine use was attributable to his brother's suicide, there is still no reason to attribute his long-term, elaborate fraud to his drug use. First, defendant's fraud continued from 2014 to his arrest in November, 2018. According to defendant, he stopped abusing drugs after a treatment program "in late 2016 and early 2017" (PSR ¶ 110) and did not return to cocaine abuse until January 2018. (PSR ¶ 111.) Yet defendant's fraud continued through this period of sobriety. (Ebadi Decl. pages 26-27.) Indeed, defendant actually used his stay at a sober living facility to victimize others there who were also in recovery there. (Ebadi Decl. page 26.) Because defendant continued his fraud regardless of whether or not he was sober, it is apparent that the fraud was not caused by his drug use.

Further, defendant's drug use generally does not seem to have prevented him from doing the things he wanted. He graduated with honors from high school, for example, while using cocaine "quite a bit" on weekends. (PSR ¶¶ 107, 116.) Similarly, he graduated in four years with a bachelor's degree from the very competitive New York University despite using cocaine there "three to four times per week." (PSR ¶¶ 107, 117.) For comparison purposes, defendant claims to have used cocaine only "a couple of times a week during the first six months" of 2018, when he was committing his new frauds in CR 19-271-AB while on bond after pleading guilty to the earlier frauds in CR 18-11-AB. Moreover, defendant's purportedly increased,

but actually intermittent, drug usage following his brother's
suicide did not stop him from succeeding as a real estate broker
(PSR ¶ 121), working as a musician, writing songs professionally
(PSR ¶ 123), wooing his wife, or starting a family (PSR ¶ 92), so it
is hard to see defendant's drug use as the cause of his criminality.

This conclusion is buttressed by the sophisticated nature of
defendant's fraud as well as its duration.  To be sure, defendant
occasionally committed simple frauds, such as bouncing checks, but
the overwhelming majority of the money he stole from his victims
came from elaborate, long-term scams involving "15 different [shell]
LLCs and more than 70 bank accounts" (PSR ¶ 17), forged and "false
documentation" supporting multi-million dollar loan applications
(PSR ¶ 21), and purported development projects that lasted over a
year (PSR ¶ 20), so it is clear that his frauds involved substantial
planning and reflection, and could not have been committed in a
drug-induced haze.

D.   **DEFENDANT ATTEMPTED TO OBSTRUCT JUSTICE**

Part of defendant's scheme involved pawning the stolen musical
instruments of one of his Airbnb renters.  (CR 18-834-AB, dkt. 1,
pages 27-28: victim Brian Zeng rented the Stradella property from
defendant and during the term of his lease an associate of
defendant's took Zeng's musical equipment from Stradella, which
defendant then pawned a few days later as though they were his own.)
When he was jailed for this by the LAPD, defendant made a coded call
over a recorded jail telephone line trying to concoct a defense to
the charges.  His wife, reading between the lines, told him that
YOHAI's associates were trying to persuade the victim to drop the
charges.  (Ebadi Decl. pages 27-28.)  While this would appear to

7

support an obstruction of justice enhancement under the guidelines, Section 3C1.1, in an abundance of caution the government does not seek one and recommends that the Court consider it only under the 3553(a) factors.

### E.    DEFENDANT NEGOTIATED A LENIENT PLEA AGREEMENT

Were it not for the skill of defense counsel in negotiating a lenient plea agreement, defendant would be facing a guideline range that was 24 months longer—in each of the two cases.  Defendant was charged in each case with a violation of 18 U.S.C. Section 1028A for using a means of identification of another during and in relation to the conspiracy to commit bank fraud to which defendant pled guilty. Section 1028A carries a mandatory-consecutive prison term of 24 months.  18 U.S.C. § 1028A(a)(1), (b)(2), and (b)(3) (A defendant convicted of 1028A "shall, in addition to the punishment for the [underlying] felony, be sentenced to a term of imprisonment of 2 years," "no term of imprisonment . . . under this section shall run concurrently with any other term of imprisonment," and the "court shall not in any way reduce the term [on the underlying felony] to compensate for" the two-year term required by this section).  Here, defense counsel negotiated a plea agreement that did not require defendant to plead guilty to the Section 1028A violation, and instead requires the government to dismiss it, although the court is still free to take this charge into account.  (CR 18-11-AB, Plea Agreement ¶ 5(b), CR 19-271-AB, Plea Agreement ¶ 3(b):  the government will "move to dismiss the remaining [Section 1028A] count[] of the information," defendant "agrees, however, that . . . the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the

propriety and extent of any departure from that range, and the sentence to be imposed")

### F.   DEFENDANT CAUSED LASTING EMOTIONAL TRAUMA AND FINANCIAL DEVASATION TO SOME OF HIS VICTIMS

Many of defendant's largest victims were professional lenders. To be sure, they suffer when defrauded by someone like defendant. And the losses they sustained must be borne by some combination of their owners, employees, and customers, but the diffusion of the losses, and the fact that these companies are in the business of lending, can make it too easy to see defendant's $13 million plus fraud primarily in terms of dollars that defendant stole, rather than the emotional toll it inflicted.

But defendant did not restrict his marks to big businesses.  He was just as likely to use his intelligence and charm to con families out of their life savings, or to steal from individuals whatever they would trust him with.  Predictably, this resulted in emotional scars, financial devastation, changes in personality, and strains in partnerships and marriages.  After a lifetime of hard work and living below their means, the Aroch family amassed a nest egg of at least $2.9 million, which they intended to use to buy a home for themselves and their three daughters.  This home was supposed to provide both shelter and long-term financial security, but due to defendant's greed and fraud, all of that is gone.  The family's "financial future is now in question, as [their] nest egg is gone," leaving them instead to try "to heal emotionally."  (Exh. 1).  Dr. Coppelson, whom defendant cheated out of a comparatively modest $250,000, has "become much more cynical and less trusting of" others, and "experienced bouts of anger and frustration" which, to

his regret, "his wife and children have borne." (Exh. 7.) Ms. Lazzarini, who along with her husband ran a business defendant defrauded out of $85,000, accurately describes defendant as a "calculative and cunning man, who has no empathy for others." Ms. Lazzarini can barely afford her mortgage and must make do with a broken down car because defendant wanted a $60,000 per week vacation rental—but not to pay for it. The stress and recriminations from their fraud losses has even led her husband to request a divorce. (Exh. 10.) Sadly, business partners turning on one another after learning that one fell for defendant's fraud is all too common. (Exh. 13.) Worse, the emotional and financial toll described above is only a small fraction of what defendant inflicted, because it is limited to the suffering of those victims brave enough to bare their scars publically.

## G. ONLY A LONG SENTENCE CAN PROTECT THE PUBLIC AND DETER SIMILAR CRIMES

The Probation Office calculated defendant's final offense level to be 37, yielding a guideline range of 210 to 262 months. Even this gives defendant the benefit of the doubt. The Probation Office recommended that defendant receive an acceptance of responsibility reduction, for example, even though defendant committed the same type of fraud in the new case (CR 19-271-AB) that he was awaiting sentencing for in the first case (CR 18-11-AB). But new criminal conduct during the pendency of sentencing ordinarily justifies a denial of acceptance of responsibility even when the new criminal conduct is unrelated to the offense of conviction. See United States v. Mara, 523 F.3d 1036, 1037 (9th Cir. 2008) (affirming district court's denial of acceptance of responsibility where

10

defendant who pled guilty to being a felon in possession of a firearm engaged in an unrelated jailhouse fight before sentencing). Of greater importance, the PSR failed to assign any role enhancement for defendant even though he led and organized more than five criminal participants in his scheme, as set forth in the Government's Sealed Objections to the Presentence Report, filed on September 5, 2019.

Either the loss of the acceptance of responsibility reduction, or the gain of the four-level role enhancement would increase defendant's guideline range to a point where the 20-year statutory maximum applicable in CR 18-11-AB would be insufficient to encompass the entire sentence. Both together would be literally off the charts, and call for a sentence of life imprisonment, or 50 years in this case, the combined statutory maximum in both cases.

Defendant has done tremendous damage to a huge number of victims. Further, he has turned a number of otherwise law-abiding citizens into criminals who aided him in his scheme. And he has shown an almost unbelievable compulsion to defraud others, to the point that he could not stop even while awaiting this Court's judgment on him in the first case, which strongly suggests that he will continue on his criminal path despite having been blessed with so many advantages. Worse, he seems to enjoy committing fraud and revels in cheating others out of their hard-earned money, as though he thought real work was only for patsies. When one of his associates jokingly referred to his Airbnb scams ("You're no Dudley do right in the house rentals[,] bro[,] you know what I'm talking about haha") defendant truthfully responded:

I'm the furthest thing from Dudley do right[.] I'm Dudley do wrong[.] I'm Dudley do whatever the fuck he wants[.]

There is one mitigating factor that argues for a below-guidelines sentence:  defendant has never been to prison before, so it is at least possible that he would change during a lengthy sentence.  The signs, however, are not good; so far in jail he has taken the money of his loved ones to buy drugs, obtained prison tattoos, and prevailed upon his associates to concoct a bogus defense for at least one charge.  Nevertheless, mindful that the sentence imposed should be the least that can adequately punish defendant, protect the public, and deter similar offenses, the government recommends a total sentence of 180 months, about half the guideline range the government believes applicable even drawing all questionable issues in his favor, to be divided between the two cases and to be served consecutively.  Now that the First Step Act provides defendants with almost two months of good-time credit per year, and with one year off for RDAP, this should result in a real sentence of less than 12 years.

Dated: September 9, 2019          Respectfully submitted,

                                 NICOLA T. HANNA
                                 United States Attorney

                                 BRANDON D. FOX
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 *Andrew Brown*
                                 _____
                                 ANDREW BROWN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

## Declaration of Sherine Ebadi

I, SHERINE D. EBADI, do hereby declare and affirm:

I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2009. I am currently assigned to the Los Angeles Field Office, Long Beach Resident Agency, where I am responsible for investigating violations of federal criminal statutes over which the FBI has investigatory jurisdiction, especially bank fraud and identity theft. I have received specialized training in these types of investigations.

**A.   YOHAI DEFRAUDED THE HOFFMANS OF THEIR $3 MILLION INVESTMENT**

YOHAI lied to Dustin and Jacob Hoffman (the "Hoffmans") to entice them to invest $3 million in the development of 1550 Blue Jay Way and then made additional false statements to lull the Hoffmans into staying in the deal. Namely, YOHAI lied about his financial wherewithal, his use of their investment, the progress of the development, and his ability to repay.

YOHAI lied about his finances

When YOHAI pitched the Hoffmans and the Hoffmans' business managers, Layne Dicker and Rob Mandel on the investment, he told them he started the real estate company, Marin Management and was making "tons of money" with his "very lucrative" Airbnb business. YOHAI said he did not need an investor in the deal, but he wanted to give the Hoffmans the opportunity to partner with him. In fact, YOHAI did not have the funds to purchase 1550 Blue Jay Way and aside from the $3 million he received from the Hoffmans, he had to borrow another $100,000 from Robert Gerner to cover closing costs.

YOHAI told them he had done substantial due diligence on 1550 Blue Jay way and it was "extremely inexpensive" and "under-priced".

13

In fact, review of documents and statements from witnesses confirmed that YOHAI paid more than $1 million over the appraised price of the property.  In my interview with YOHAI, he told me that he paid more than the appraised value for the property.

<u>YOHAI lied about his use of funds</u>

On June 17, 2015, YOHAI sent the Hoffmans an email followed by a "Deal Memo" dated June 25, 2015, which detailed the terms of the deal.  Specifically, the Hoffmans would contribute $3 million, which would be used toward the down payment.  YOHAI would obtain necessary permits for the property and get it ready for a refinance and construction loan.  YOHAI indicated costs above the Hoffmans' initial $3 million contribution would be covered by YOHAI.  In exchange for their contribution, the Hoffmans would receive their initial principal, plus 10% interest annually and 50% of the profits from the resale of the property.

On July 8, 2015, the Hoffmans wired $3 million to YOHAI's account in furtherance of this deal.  YOHAI sent $2,790,105.94 of the Hoffmans' funds to close on 1550 Blue Jay Way.  The remaining approximately $210,000 was used by YOHAI for personal and other expenses unrelated to 1550 Blue Jay Way.  In my interview with YOHAI, he told me that he kept $210,000 of the Hoffmans' funds to "reimburse" himself.

Layne Dicker told me he and the Hoffmans did not learn that YOHAI kept $210,000 of their $3 million investment until sometime in early 2016.  This prompted Dicker on February 11, 2016 to file a deed of trust ("DOT") to secure the Hoffmans' interest in 1550 Blue Jay Way.  When Dicker asked YOHAI about the $210,000, YOHAI first

14

said the funds were kept in escrow.  Later YOHAI said he used the funds to pay someone else.  Then YOHAI said he used the funds to reimburse himself.  YOHAI had no authorization to keep any of the Hoffmans' investment for himself.

Layne Dicker told me that when YOHAI learned about the DOT, YOHAI said it had to be removed so he could obtain a refinance on the property.  This is how Dicker and the Hoffmans learned that YOHAI was attempting to obtain another loan against 1550 Blue Jay Way.  In April 2016, the Hoffmans and YOHAI drafted an "Interim Understanding of the Members of 1550 Blue Jay Way, LLC" ("Interim Understanding").  Pursuant to this agreement, the Hoffmans agreed to remove their DOT under the condition that the proceeds of any new financing would be deposited into a 1550 Blue Jay Way LLC account jointly held by YOHAI and Jacob Hoffman.  Before the Interim Understanding was fully executed, YOHAI told Dicker and the Hoffmans that they needed to remove the DOT, or his Genesis loan would go into default.  As such, the Hoffmans' agreed to remove their DOT, with the understanding that proceeds of any new loan would be managed jointly.

In furtherance of their agreement, Jacob Hoffman signed account documents adding him to the 1550 Blue Jay Way LLC account at BOC.  These documents were sent to Perris Kaufman and his assistant, Britney Treliving at BOC.  In my interviews with Dicker and Jacob Hoffman, both believed Jacob Hoffman had indeed been added as a signor on the 1550 Blue Jay Way LLC account at BOC.  However, review of bank records show Jacob Hoffman was never added to YOHAI's 1550 Blue Jay Way account at BOC.

Between April 2016 and August 2016, Dicker made several requests for information on how the proceeds of the new loan were used and requested copies of bank statements for the 1550 Blue Jay Way LLC account at BOC.  Finally, on August 1, 2016, YOHAI's accountant, Alan Fetzer, sent Dicker copies of the 1550 Blue Jay Way LLC bank statements, which showed proceeds of the loan had already been depleted by YOHAI.

In my interview with Alan Fetzer, he told me that YOHAI sent him falsified bank statements for the 1550 Blue Jay Way LLC account and instructed him to forward them to the Hoffmans, but Fetzer refused.

In my interview with YOHAI, he admitted that he had his then-assistant create falsified bank statements for the 1550 Blue Jay Way LLC account to send them to the Hoffmans to support his lies to them that he had not used the proceeds of the RS Lending loan.  YOHAI lied to the Hoffmans about this because he did not want them to "go ballistic".

YOHAI lied about the progress of the investment

After learning that YOHAI had already spent the money from the loan, the Hoffmans decided to pull out of the deal.  In response to this, on August 4, 2016, YOHAI sent the Hoffmans an email which read, "[Bruce] informed me after his call with Layne [Dicker] that you are pulling out of the deal.  I am sad to hear the news and wanted to give you a comprehensive update as to where the project currently stands…At this point we are only waiting on shoring approval to begin construction…"  YOHAI further detailed all of permits had been obtained.  In fact, the permits had not been

obtained because YOHAI had failed to pay his permit expediters, Crest Real Estate.  What YOHAI did not tell the Hoffmans was that his loan to Genesis was in payment default at this time.

In September 2016, when the Hoffmans learned of the default to Genesis, YOHAI made several false representations to the Hoffmans that Genesis had been paid.  For example, on September 22, 2016, YOHAI sent the Hoffmans and email purportedly from Genesis General Counsel, John Day, which claimed payment had been made to Genesis. In fact, YOHAI had altered an email from Day which said that payment had <u>not</u> been made to Genesis, and then sent the altered version to the Hoffmans.

In my interview with Dicker, he told me that he contacted Day to confirm the payment had been received and Day told him YOHAI had altered his original email and that payment had <u>not</u> been received. Similarly, in my interview with Day, he told me YOHAI had altered his email in this manner.

<u>YOHAI lied about his ability to repay the Hoffmans</u>

In September and October 2016, YOHAI made a series of false and misleading statements to the Hoffmans to make them think he could and was going to repay them.

For example, on September 26, 2016, YOHAI sent the Hoffmans a purchase agreement for YOHAI's property at 2521 Nottingham.  This agreement purported that Machiavelli Group was purchasing one of YOHAI's other properties at 2521 Nottingham for $7.5 million.  YOHAI followed this up with an email on October 7, 2016 which said that his "plan is that the proceeds from the sale of this property [2521 Nottingham] will take out your equity investment of 3M in Blue Jay

17

plus your preferred interest…Timeline to closing on this transaction is roughly 30 days…"

In fact, the purchase agreement was created by YOHAI to lull the Hoffmans into thinking he could repay them.  In my interview with YOHAI, he told me that he sent the agreement to "buy time".

YOHAI did not cure the default on 1550 Blue Jay Way which resulted in the property being foreclosed and sold for $6 million, which was only enough to cover YOHAI's debt to Genesis.  YOHAI never repaid the Hoffmans.  The total loss to the Hoffmans is $3 million.

**B.   YOHAI TOOK OVER THE IDENTITY OF HIS COUSIN MATTHEW BEHAR, LEAVING HIM WITH OVER $100,000 OF YOHAI'S DEBT**

In early 2018, YOHAI falsely told Behar that he had worked out a deal with the government on his previous charges that meant he was not going to jail.  YOHAI also claimed he was doing well financially, but his credit was still poor so he wanted Behar to obtain credit cards using Behar's credit but for YOHAI's use.  YOHAI promised to pay the balance on the credit cards each month, plus additional funds to Behar, which would help Behar pay for school. The first month, YOHAI paid off the balance on the cards, but after that, YOHAI ran up $108,000 in charges across three different cards and did not pay any of the balances.  YOHAI falsely told Behar he had made the payments several times and on at least three separate occasions, Yohai had Behar on a three-way call with the credit card companies in which Yohai verbally paid the balances with a bank account.  On each occasion, the payment ended up being returned due to insufficient funds.  Behar was unable to recover any of these funds from Yohai.

18

**C.    YOHAI DEFRAUDED DR. COPPELSON OUT OF OVER $200,000**

<u>Interview of victim Dr. Coppelson</u>

In September 2018, I interviewed Dr. Aaron Coppelson, owner of a luxury property I call "Marcheeta". Coppelson told me the following:

In August 2018, Coppelson had Marcheeta listed for sale at $20 million. Coppelson's real estate agent, Sam Real, handled the open houses for this property. YOHAI attended one of the open houses and made an offer of $15.5 million to purchase Marcheeta.

Coppelson agreed to meet YOHAI for lunch to discuss the offer. During this lunch, YOHAI told Coppelson he owned a property on Stradella in Bel Air which was worth $20 million. YOHAI said he only owed $7 million on Stradella and he could take $13 million of equity out of Stradella to help fund the purchase of Marcheeta. The value of Stradella is not $20 million, but closer to $8.8 million per the Los Angeles County Assessor's Office 2018 assessment. Furthermore, per United States Bankruptcy records, the secured and unsecured claims against Stradella exceed $9.5 million. Given these facts, YOHAI had no equity in the property.

Ultimately, Coppelson and YOHAI were unable to come to an agreed purchase price. YOHAI told Coppelson he had a number of high net worth clients for whom he finds properties to lease. YOHAI offered to refer some of these clients to Coppelson to lease Marcheeta while it was listed for sale. Coppelson agreed.

Shortly after this, YOHAI said he had a client who wanted to rent Marcheeta for a weekend to hold a seminar. The client was willing to pay $20,000 for the weekend. Coppelson agreed.

The renter stayed at Marcheeta for the weekend.  When Real, Coppelson's real estate agent, tried to pick up the $20,000 from the renter, he was told payment had already been made to YOHAI directly. Coppelson contacted YOHAI and asked for the $20,000.  YOHAI wrote Coppelson a check for $20,000 and Coppelson deposited it into his account at First Republic Bank ("FRB").

Shortly thereafter, YOHAI said he had another client who wanted to rent Marcheeta for one night for $10,000.  Coppelson agreed. Again, when Real went to pick up the rental fee, the renter said he had already paid Yohai.

Around this same time, Coppelson was notified by FRB that YOHAI's initial $20,000 check had returned for NSF.  Coppelson told YOHAI and YOHAI wrote him another check, which Coppelson deposited into FRB.

Within a short period of time, YOHAI said he had another client, an NBA basketball player, who wanted to rent Marcheeta for two months for $160,000.

Similar to the other two renters, when Real went to pick up the rent from the NBA basketball player, Real was told the funds had already been paid to YOHAI.  Coppelson asked YOHAI for the funds and YOHAI agreed to send a wire transfer.

On more than on occasion, YOHAI told Coppelson he had wired the funds.  YOHAI even provided Coppelson with a wire reference number and yet, no funds ever arrived.  On two separate occasions, YOHAI told Coppelson that YOHAI's attorney had wired the funds.  Still no funds arrived.  On at least one occasion, Coppelson spoke with

YOHAI's attorney on the phone and he said the issue with the wire was his fault and a new wire was on its way, yet no funds arrived.

Coppelson provided me with an email from YOHAI's attorney to yohai481@gmail.com which was further forwarded to Real and Coppelson dated August 31, 2018.  The email from YOHAI's attorney contained the subject line, "Your Same Day wire transfer was successfully sent".  The body of the email contained a wire transfer confirmation from Bank of America for $180,000.  When YOHAI forwarded the email, he wrote, "See below Full payment sent".

On October 2, 2018, I received records from Bank of America for YOHAI's attorney PLLC's account.  The sole signatory on the account is YOHAI's attorney.  Review of this account revealed that on August 31, 2018, the balance was $106.14.  On no day during the entire month of August 2018 was the balance higher than $505.43. Furthermore, the only outgoing wire from the account was on August 10, 2018 for $400.00.  Based upon my review of this account, not only was there no wire transfer to Coppelson for $180,000, there were not sufficient funds in the account to cover such a wire transfer.

In addition to sending a falsified wire transfer confirmation, YOHAI also wrote Coppelson a series of checks to cover the amounts owed.  At least five checks returned NSF and Coppelson's bank refused to accept any more checks from YOHAI.

In an apparent attempt to lull Coppelson and Real, YOHAI sent photographs of deposit slips and cashier's checks as proof he had deposited the money into Coppelson's account.  Despite these photographs, no money was ever deposited into Coppelson's account.

Coppelson provided me with screenshots of text messages YOHAI sent to Real which were further forwarded to Coppelson. The text messages from YOHAI came from (323)422-5631. I know from my own telephonic communication with YOHAI that he utilizes this number. The text messages from YOHAI contained the following:

- On August 6, 2018, YOHAI sent a photograph of a deposit slip purportedly showing $60,000 deposited into Coppelson's account.
- On August 6, 2018, YOHAI sent a photograph of a wire confirmation purportedly showing $60,000 had been wired to Coppelson's account.
- On August 17, 2018, YOHAI sent a photograph of a deposit slip purportedly showing $55,000 was deposited into Coppelson's account.
- On August 22, 2018, YOHAI sent a photograph of a deposit slip purportedly showing $55,000 was deposited into Coppelson's account.

Despite all of these supposed "confirmations", the funds were never received into Coppelson's account.

Coppelson told me that at one point, YOHAI offered to leave his Rolls Royce Phantom as collateral for the money owed. The Rolls Royce stayed with Real for a couple of days until an unknown male arrived and said the vehicle actually belonged to him and not YOHAI. The unknown male showed the pink slip for the car and took it.

At another time, YOHAI said he was coming to Coppelson's house to pay him the money he owed. YOHAI said he was getting Coppelson's money from a prominent marijuana grower who owed YOHAI $300,000. When YOHAI arrived at Coppelson's house, he was driving a Porsche

22

Panamera.  YOHAI said he did not have Coppelson's money, but he pulled out a large bag of marijuana from the trunk of the vehicle and offered it to Coppelson as collateral for the money owed. Coppelson refused.

At Coppelson's request, the NBA basketball player who had rented Marcheeta left the property in mid-September 2018.  On September 22, 2018, Coppelson and Real went to Marcheeta to make sure it was in good condition so they could continue to show it to potential buyers.  When they arrived, they encountered two unknown males, an unknown female, a number of children and dogs.  Neither Coppelson nor Real were aware of, or authorized anyone to stay in the residence.

One of the unknown males told Coppelson he paid YOHAI $7,000 to rent Marcheeta for a birthday party.  The unknown male showed Coppelson a contract with YOHAI and said $1,000 of the funds was to use a Rolls Royce Phantom which was parked in the driveway.

Coppelson subsequently provided me with a victim letter, attached, which enumerates $248,000 in lost rental fees that YOHAI took, as well as another $6,899 in related legal expenses as of July 30, 2019.

<u>Interview of Coppelson's Real Estate Agent Sam Real</u>

On October 10, 2018, I interviewed Sam Real and he told me the following:

Real represented Coppelson to sell a property at 1814 Marcheeta Pl.  In July 2018, during one of the open house showings for Marcheeta, YOHAI arrived and said he wanted to make an offer.  YOHAI claimed to own a property located on Blue Jay Way, which is down the

street from Marcheeta.  I know this to be a lie because Blue Jay Way was foreclosed upon by Genesis Capital in November 2017 and sold to a third party in July 2018.

YOHAI told Coppelson he purchased high-end properties, leased them, and then sold them when they appreciated.  YOHAI offered to bring his clients to Marcheeta as well.  Coppelson agreed to let YOHAI refer potential renters for Marcheeta.

The first clients YOHAI brought were a group of people who wanted to hold a seminar at Marcheeta and agreed to pay $20,000 rent for the weekend.  YOHAI was paid by the renters and subsequently wrote Coppelson a check for $20,000.

The next renter was a professional soccer player who wanted to rent Marcheeta for two weeks and agreed to pay $60,000.  As before, the renter paid YOHAI and YOHAI wrote Coppelson a check.

The next renter was a NBA basketball player who wanted to rent Marcheeta for two months and agreed to pay around $50,000 per month. Again, the renter paid YOHAI.

All of the checks YOHAI wrote to Coppelson bounced.  When Coppelson's bank would no longer accepted checks from YOHAI, YOHAI sent fake wire transfer confirmation emails from his New York lawyer.  Despite these confirmation, no funds were ever received.

Real provided two emails from YOHAI's attorney which included confirmation of wire transfers from YOHAI's attorney's BOFA account. One dated August 21, 2018 for $78,000 and another dated August 31, 2018 for $180,000.  As stated above, I reviewed YOHAI's attorney's BOFA account and found that on August 31, 2018, the balance was $106.14.  On no day during the entire month of August 2018 was the

balance higher than $505.43.  Furthermore, the only outgoing wire from the account was on August 10, 2018 for $400.00.  Based upon my review of this account, not only were there no wire transfers to Coppelson for $78,000 or $180,000, there were not sufficient funds in the account to cover these wire transfers.

Real told me he spoke with YOHAI's attorney on the phone at least twice to inquire about the funds which had been wired but never arrived.  YOHAI's attorney told Real he had wired the funds, but due to a client bouncing a check to YOHAI's attorney, the wire never went through.

On one occasion, YOHAI offered to give his Rolls Royce Phantom as collateral for the money owed to Coppelson.  Real kept the Phantom at his office for three days until an unknown male arrived, said he owned the car and showed Real the pink slip.  The unknown male left with the vehicle.

After the NBA basketball player left Marcheeta, Real met Coppelson at the property.  Upon arrival, Real and Coppelson saw an unknown male walking inside the property with two dogs.  Coppelson notified the police.  The unknown male told the police, Coppelson and Real that he had leased Marcheeta from YOHAI.

**D.  YOHAI DEFRAUDED VICTIM LAZZARINI OUT OF OVER $80,000 FOR A LUXURY HOME RENTAL**

In April 2018, YOHAI contacted Ms. Lazzarini to rent a luxury estate in La Quinta at $120,000 for two weeks.  The credit card that YOHAI gave Ms. Lazzarini as a down payment on the rent was from an account that had been closed more than a year earlier due to a credit card bust-out scheme YOHAI perpetrated.  YOHAI paid $31,700 of the rent with a wire from a third party and then falsely told

Lazzarini that he was paying the balance of the rent with another wire, which never arrived.  YOHAI continued to make false promises to pay Lazzarini with cash, but he only paid $2,500 of the $88,992 owed, leaving a loss of $86,492.  (Please see accompanying victim letter for more details.)

### E. DEFENDANT DEFRAUDED THOSE HE MET AT REHAB, AND DURING HIS PERIOD OF SOBRIETY

Upon his departure from Cottonwood Rehabilitation, YOHAI's most recent rehabilitation facility in January 2017, YOHAI recruited other patients from Cottonwood to live at a sober living house he was running.  However, YOHAI only used this as a platform to defraud these patients.  In some cases, like victim Brian's, YOHAI refused to refund their $5,000 security deposits, and in other more disturbing cases, like Kris's, YOHAI charged $35,000 per month for "detox" care which he could not and did not provide.

By mid-2017, YOHAI's new fraud scheme was beginning.  YOHAI used Airbnb to rent out 779 Stradella Rd. and 1550 Blue Jay Way. Based upon email and text message communication along with witness interviews, YOHAI regularly cheated the short-term renters by charging large security deposits which he did not intend to return and, in fact, did not ever return.  On some occasions, YOHAI would promise to return the deposits, but never follow through and on other occasions, YOHAI would make up damages to justify keeping the security deposits.  For example, one victim, Janet Souk, was charged $4,500 rent and $2,500 security deposit to rent Stradella for a weekend in September 2017.  After departing, the renter was promised a refund of her security deposit several times by YOHAI but only received bouncing checks and false promises for PayPal refunds.  For

three months, she strived to obtain a return of her deposit without success. This same story is replayed by several other victim renters in 2017.

Later in 2017, YOHAI began attempting a new real estate fraud by submitting false and fraudulent loan applications to several mortgage brokers/lenders in an attempt to obtain millions in new real estate loans. For example, in December 2017, YOHAI submitted a Form 1003 loan application to obtain $6,600,000 in funding to purchase 15433 Brownwood Pl., Los Angeles. In this application, YOHAI claimed to make $200,000 per month and own properties which were either already foreclosed upon (like 1550 Blue Jay Way, Los Angeles), or never owned by him at any time (like 29 Howard St., New York). Similarly, in November 2017, YOHAI submitted a Personal Financial Statement showing his annual salary as $2 million and his real estate equity as more than $16 million. In fact, YOHAI had no source of income during this time other than the fraud and all of his properties were already foreclosed upon or on the brink of foreclosure.

### F.   YOHAI SOUGHT WITNESS TAMPERING

On October 30, 2018--the day YOHAI was arrested by LAPD for pawning the musical equipment of victim Brian Zeng--YOHAI called Jessica Manafort from jail on a recorded call and told her to contact Chris Ellis and tell Chris Ellis to call Chris Hernandez and tell Chris Hernandez to let everyone know that Hernandez gave YOHAI Brian Zeng's musical equipment in exchange for Zeng's security deposit. YOHAI told Manafort one of the reasons he was in jail was because he pawned Zeng's musical equipment. Later that same day, YOHAI called Jessica Manafort again from jail on a recorded call.

Jessica Manafort told YOHAI that YOHAI's assistant and another person were scrambling to try and figure out how to get the guy whose musical equipment YOHAI pawned [Brian Zeng] to say he was not pressing charges in court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: September 9, 2019

/s *Sherine Ebadi*

Sherine Ebadi